# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>Plaintiff,<br><br>vs.<br><br>GINA CHAMPION-CAIN AND ANI DEVELOPMENT, LLC,<br><br>Defendants, and<br><br>AMERICAN NATIONAL INVESTMENT, INC.,<br><br>Relief Defendant. | Case No. 19-cv-01628-LAB-AHG<br><br>**ORDER GRANTING JOINT MOTION REGARDING USE OF FUNDS FROM CHICAGO TITLE COMPANY ESCROW ACCOUNT; AND**<br><br>**FINDINGS REGARDING RECEIVERSHIP**<br><br>[Docket numbers 157, 185.] |

**Joint Motion**

On December 10, 2019, a Joint Motion Regarding Use of Funds From Chicago Title Company Escrow Account [DKT. No. 157] was filed with the Court by: (a) certain interested parties who deposited money into escrow with Chicago Title Company or invested in connection with defendants ANI Development, LLC and Gina Champion-Cain's (collectively, "Defendants") allegedly fraudulent California Department of Alcoholic Beverage Control liquor license escrow scheme (the "Lenders/Investors"); (b) Plaintiff United States Securities and Exchange Commission ("SEC"); and (c) Receiver Krista Freitag ("Receiver") on behalf of the Receivership Entities (altogether, the "Parties").

Because some non-parties who had appeared in the action had not joined in the motion, the Court gave all parties, and interested non-parties an opportunity to object to file objections. (*See* Docket no. 159.) One objection was filed (Docket no. 172), which this order discusses below. The motion for leave to correct the response (Docket no. 185) is **GRANTED** and the opposition is deemed amended. Having considered the briefing, the Court concludes that the request is consistent with its intent as expressed at the earlier hearing held on November 18, 2019. The Court accepts the joint recommendation, and the joint motion is **GRANTED.**

It is hereby **ORDERED** that:

1. <u>Immediate Release of a Portion of the $11.3 Million in Funds Turned Over by Chicago Title ("Funds Turned Over") for Use by Receiver</u>. $2.5 million of the approximately $11.3 million in Funds Turned Over to the Receiver by Chicago Title immediately will be available for use by the Receiver for operating and asset-related expenses critical to the preservation or monetization of value of receivership assets, as well as Court-approved administrative expenses (subject to fee applications approved by the Court). These operating and asset-related expenses

- 1 -

ORDER GRANTING JOINT MOTION REGARDING USE OF FUNDS FROM CHICAGO TITLE COMPANY ESCROW ACCOUNT
Case No. 19-cv-01628-LAB-AHG

include, but are not limited to, debt service, property taxes, utilities, maintenance and repair, sale-related expenses including appraisals, Phase I and property condition reports, and insurance premiums for the properties that the Receiver believes have value that would otherwise be eroded by failure to pay or would otherwise impact the Receiver's ability to monetize the asset value.  Operating and asset-related expenses also includes payroll for remaining employees of the receivership entities, and PTO for terminated and remaining employees of the receivership entities, the failure to pay which could result in interest, penalties, *etc*. The Funds Turned Over will not be used for expenditures on properties once the Receiver has determined such properties do not have value to the receivership estate and are going to be abandoned or allowed to go into foreclosure.

2. <u>Replenishment of the Funds Turned Over</u>.  As the Receiver sells assets of the receivership estate, she will "repay" the $2.5 million used from the Funds Turned Over from the sales proceeds of those other assets, after ensuring sufficient retention of funds to pay the ongoing and necessary expenses of the receivership estate.  In other words, once sufficient sales of receivership assets have occurred such that the net proceeds generated cover the ongoing and necessary expenses of the receivership estate, including administrative expenses, the Receiver, unless otherwise authorized or directed by the Court, will maintain a cash balance in the receivership estate of at least $11.3 million.  This "repayment" provision, however, shall not apply to distributions pursuant to a Court-approved plan of distribution, as to which all rights are being reserved.

3. <u>No Further Use of Funds Turned Over Without Court Approval</u>. Beyond the $2.5 million immediately released pursuant to Paragraph 1, the Receiver will not use any further amounts of the Funds Turned Over without obtaining Court approval via a noticed motion with opportunity of the interested parties to oppose and object, which rights are expressly reserved.

4. <u>Receivership Funds Not to be Used to Prosecute Claims Against Chicago Title Without Court Approval</u>. The Receiver and her counsel may conduct investigations, research, and analysis, including analysis of the role played by Chicago Title and its employees in the alleged fraudulent scheme of which the Defendants have been accused and claims that the Receiver and the Receivership Estate may have against Chicago Title. However, the Receiver shall not file or prosecute claims against Chicago Title without leave of Court upon a noticed motion and opportunity of the interested parties to oppose and object, which rights are expressly reserved.

5. <u>No Extension of Prosecution Bar to Include Chicago Title</u>. The Receiver shall not seek to extend the prosecution bar in the Appointment Order to include Chicago Title to prohibit the prosecution of claims against Chicago Title. Furthermore, notwithstanding anything contained in the Appointment Order, the Parties agree that nothing in the Appointment Order limits or restrains anyone from seeking monetary or other relief against Chicago Title. The Receiver presently has no intent to seek a stay of any Lenders/Investors lawsuit against Chicago Title, but

reserves the right to do so if she believes, in her professional judgment, that seeking to stay one or more such lawsuits is likely to accelerate or enhance the recovery for the benefit of all Lenders/Investors. If the Receiver subsequently makes such a determination, she will seek any such stay only upon noticed motion, which the interested parties shall be entitled to oppose.

6. <u>Reservation of Rights</u>. The Parties reserve all rights regarding: (a) the nature, extent and priority of claims and objections to any such assertions or claims; and (b) any plan of distribution, including the appropriateness of either pooling or segregation of receivership assets. Nothing herein is intended to be a release or waiver of claims or rights by any party.

**Findings Regarding the Court's Continued Equitable Jurisdiction**

In their objection to the joint motion, the Edelmans argue that the Court is obligated to make express written findings concerning its continued equitable jurisdiction and explaining why it is preferable to liquidation in a bankruptcy court. In support of this, they cite *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600 (9th Cir. 1978). While the Court's position has been set forth in earlier written and oral rulings, this order now supplements those.

Initially, this action was assigned to District Judge Marilyn Huff, who granted a preliminary injunction and imposed a receivership. After the case was transferred to the undersigned judge, the Court afforded parties and interested non-parties (such as investors and creditors) notice and an opportunity to be heard as to the propriety of continuing the receivership. Some, including the Edelmans, filed briefing, and their counsel was given an opportunity to be heard. The Court, however, determined that the receivership ought to remain in place, and issued orders authorizing the receiver to take various actions to manage receivership assets. In carrying out her duties, the

receiver is required to file reports with the Court, and must seek leave before taking various actions. The Court has ordered that notice be provided to interested parties, so they can monitor the case and take action if appropriate. (*See* Docket no. 126 at 2:11–13.) Particular transactions such as the sale of real property have been referred to Magistrate Judge Allison Goddard, who has been authorizing briefing on those issues and has given non-parties an opportunity to be heard.

The Edelmans cite examples of receiverships they believe were poorly managed and resulted in waste and loss. But there does not appear to be any indication that is happening here, or that it is likely to happen. The receivership has been proceeding apace to manage and liquidate assets, and to retain as much value for investors as possible. The Court and the receiver are familiar with the facts and procedural history of the case, and transactions are already underway. For example, assets are being sold or listed for sale. Transferring this matter to a bankruptcy court would introduce extra cost and reduce efficiency, without any clear offsetting benefits. In addition, transactions that are already taking place would be disrupted, resulting in lost money and needless delay. Although some non-parties have objected, most appear reasonably satisfied, as evidenced by the joinder in or non-objection to the joint motion from most of them.

The Court's continued oversight of the receiver, and the ability of parties and other interested persons to object or make their positions clear serve as checks against serious waste and abuse. Necessarily, some investors will not emerge as well as if the matter were proceeding in bankruptcy. But for investors and creditors overall, the receivership appears to be functioning efficiently and well, and appears likely to produce results that are as good as could be expected.

/ / /

/ / /

/ / /

These reasons, in addition to reasons already set forth in the Court's orders, support the continuation of the receivership.

Dated: 7/16/2020

*[signature: Larry A. Burns]*

Honorable Larry Alan Burns
Chief United States District Court Judge