1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9            **SOUTHERN DISTRICT OF CALIFORNIA**
10
11  | SECURITIES AND EXCHANGE | Case No.: 19-cv-1628-LAB-AHG |

SECURITIES AND EXCHANGE
COMMISSION,

                            Plaintiff,

v.

GINA CHAMPION-CAIN and ANI
DEVELOPMENT, LLC,

                    Defendants, and

AMERICAN NATIONAL
INVESTMENTS, INC.,

                Relief Defendant.

Case No.: 19-cv-1628-LAB-AHG

**ORDER:**

**1) APPROVING RECEIVER'S
RECOMMENDED TREATMENT
OF CLAIMS (ALLOWED,
DISALLOWED, DISPUTED),
[Dkt. 807-12, 807-15, 853-3];**

**2) APPROVING DISTRIBUTION
METHODOLOGY, [Dkt. 807];**

**3) APPROVING PROPOSED
DISTRIBUTION PLAN,
[Dkt. 807]; and**

**4) GRANTING LEAVE TO FILE
EXCESS PAGES, [Dkt. 806]**

24
25      Krista Freitag (the "Receiver"), the Court-appointed permanent receiver for
26  Defendant ANI Development, LLC, Relief Defendant American National
27  Investments, Inc., and their subsidiaries and affiliates (the "Receivership
28  Entities"), moved for an order approving the Receiver's (1) recommended

treatment of claims (allowed, disallowed, disputed), (2) distribution methodology, and (3) proposed distribution plan (the "Distribution Motion"). (Dkt. 807). The Receiver's motion was opposed by numerous interested non-parties. (Dkt. 827, 831, 837, 838, 840, 921).

Following proper notice and a hearing on the motion, and having considered the filings, arguments of counsel, and relevant law, the Court **OVERRULES** the objections; **GRANTS** the Distribution Motion; and **APPROVES** the Receiver's recommended treatment of claims, distribution methodology, and distribution plan.

## I.   BACKGROUND

### A.   SEC Action and Claims Process

In August 2019, the U.S. Securities and Exchange Commission ("SEC") initiated this enforcement action against Gina Champion-Cain, ANI Development, LLC, and American National Investments, Inc., alleging that Champion-Cain defrauded investors through a fraudulent, multi-level investment scheme she operated through the defendant entities. (*See generally* Dkt. 1, Compl.). The Court appointed the Receiver to manage the Receivership Entities, accounting for their assets and distributing funds received through illegal conduct back to investors. (Dkt. 6).

To determine the Receivership Estate's liability, the Receiver conducted a forensic accounting and, with the Court's approval, (Dkt. 716), calculated (1) net loss amounts for each investor with the money-in, money-out ("MIMO") method and (2) each investor's prior recovery rate. (Dkt. 807-1 at 8). MIMO net losses were found by taking the total amount an investor paid into the scheme (money-in) and subtracting the total amount the investor received back in payments (money-out). (*Id.*). The net loss amounts were then reduced by the amount each investor received from settlements with third parties. (*Id.*). The calculations didn't consider additional amounts claimed by investors such as interest, lost profits, or

attorneys' fees. (Dkt. 681-1 at 15). Following the Receiver's motion, (Dkt. 681), the Court approved procedures for the administration of investor claims against the Receivership Estate; set the claims bar date; and approved claims bar date notices, proof of claim forms, and W9 forms. (Dkt. 716). The Receiver sent claims bar date notices, proof of claim forms, and W9 forms to all known investors. (Dkt. 807-1 at 8). Each proof of claim form contained the recipient's individualized MIMO net loss calculation with transaction level detail. (*Id.*). Potential investor-claimants were permitted to challenge the Receiver's calculations by providing additional documentation. (*Id.*) After reviewing all claimant submissions, the Receiver sent additional materials to those claimants with deficiencies or specific claim disputes. (*Id.* at 5). The Receiver also reviewed claims from the Receivership Entities' trade and tax creditors. (Dkt. 807 at 27–31).

In addition to administering the claims process, the Court authorized the Receiver to pursue and, when possible, settle clawback claims against non-parties that profited from the fraudulent scheme. (Dkt. 493, 551). The Court recently approved the $24 million settlement agreement the Receiver reached with Chicago Title Company and Chicago Title Insurance Company (collectively, "Chicago Title"). (Dkt. 927). That settlement agreement will pay investors that joined the settlement 70% of their MIMO net losses, while those that didn't join will receive 100% of their MIMO net losses. (Dkt. 795-1 at 18–19). The Receiver estimates the Chicago Title settlement will "pave the way" for an aggregate investor recovery between 90% and 95%. (*Id.* at 5).

//

//

//

//

//

//

**B.    Recommendation for the Treatment of Claims, Proposed Distribution Methodology, and Proposed Distribution Plan**

At the conclusion of the claims review process, the Receiver filed the Distribution Motion, asking the Court to approve the recommended treatment of claims, proposed distribution methodology, and proposed distribution plan.[1] (Dkt. 807). The Distribution Motion details the Receiver's forensic accounting and review of disputed claims and recommends which claims should be allowed and disallowed. The Receiver also recommends the claim amount for each allowed claim based on her MIMO net loss calculations. The proposed allowed claims and their amounts, as revised, are attached as Exhibit A to the Receiver's supplemental declaration in support of the motion (the "Receiver's Supplemental Declaration"). (Dkt. 853-3). The proposed disallowed claims are attached as Exhibit I to the Receiver's declaration in support of the motion (the "Receiver's Declaration"). (Dkt. 807-12). The proposed treatment of claims by trade and tax creditors is attached as Exhibit L to the Receiver's Declaration. (Dkt. 807-15). To expedite distributions, the Receiver proposes procedures for making future adjustments to approved claims (including amounts) and requests the authority to file a "Notice of Allowed Claim Adjustment" as necessary. (Dkt. 807-1 at 31–32).

In addition to recommending treatment for each claim, the Receiver also proposes a distribution plan and distribution methodology. (*Id.* at 10–11, 31–34). To determine distribution amounts for each claimant, the Receiver recommends using the Rising Tide distribution methodology. (*Id.* at 10–11). The Rising Tide method seeks to bring all claimants to an equivalent rate of recovery by

---

[1] The Receiver filed an *ex parte* motion for leave to file a memorandum in support of the Distribution Motion in excess of the twenty-five-page limit imposed by Civil Local Rule 7.1(h). (Dkt. 806). The Receiver concurrently filed the Distribution Motion and overlength supporting memorandum, (Dkt. 807-1), which the Court took into consideration in reaching its decision. Good cause appearing, the Receiver's *ex parte* motion is **GRANTED**. (Dkt. 806).

considering pre- and post-receivership recoveries. (*Id.*) A detailed description of the mechanics of the Rising Tide distribution methodology is attached as Exhibit B to the Receiver's Declaration. (Dkt. 807-5). The proposed distribution plan is attached as Exhibit A to the Receiver's Declaration. (Dkt. 807-4). The Receiver also proposes procedures for making interim distributions to holders of allowed claims and requests the authority to determine, in her business judgment, the appropriate total amount of distributable Receivership funds and file a "Notice of Interim Distribution." (Dkt. 807-1 at 32–34).

The Receiver filed the Distribution Motion on May 31, 2022, (Dkt. 807), and the Court set a set a ninety-day briefing and hearing schedule, (Dkt. 812). The Court permitted interested non-parties opposing the Distribution Motion ("Objectors") to file opposition briefs, (*id.*); allowed interested claimants and Objectors to attend the hearing both in person and telephonically, (Dkt. 874); heard oral argument on the Distribution Motion, (*see, e.g.*, Dkt. 884 at 6:22–9:21, 32:19–36:1, 48:14–49:25); and permitted supplemental briefing after the hearing, (Dkt. 914, 921, 922).

## II.   LEGAL STANDARD

The "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986). "[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *Id.* at 1037; *see also SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978) ("[I]t is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership."). This "authority derives from the inherent power of a court of equity to fashion effective relief," *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980), and includes the ability to distribute receivership assets, *see, e.g.*, *SEC v. Elliott*, 953 F.2d 1560,

1569 (11th Cir. 1992). Any distribution should be done fairly and equitably. *Id.*

When administering the distribution of receivership assets, federal district courts may "make rules which are practicable as well as equitable," including approving the use of summary procedures. *Hardy*, 803 F.2d at 1038, 1040; *see also Elliott*, 953 F.2d at 1566 (citing *Wencke*, 783 F.2d at 837; *United States v. Ariz. Fuels Corp.*, 739 F.2d 455, 460 (9th Cir. 1984)) ("A summary proceeding reduces the time necessary to settle disputes, decreases litigation costs, and prevents further dissipation of receivership assets."). Specifically, "[r]eceivership courts have the general power to use summary procedure in allowing, disallowing, and subordinating the claims of creditors." *Ariz. Fuels*, 739 F.2d at 458; *see also Wencke*, 783 F.2d at 836–38 (approving summary proceedings to adjudicate claims on receivership assets); *SEC v. Universal Fin.*, 760 F.2d 1034, 1037 (9th Cir. 1985) (same). Generally, it is the claimant's burden to establish a valid claim against the receivership estate. *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000) (describing the general rule that, in the bankruptcy context, creditors must establish a valid claim against the debtor); *see also SEC v. Cap. Consultants, LLC*, 397 F.3d 733, 745 (9th Cir. 2005) (finding bankruptcy law "analogous" to and, therefore, persuasive in the administration of receivership estates).

The Court considers the Distribution Motion under traditional principles of equity. First among these is the principle that "equity demands equal treatment of victims in a factually similar case." *Cap. Consultants*, 397 F.3d at 738–39; *see also SEC v. Enter. Tr. Co.*, No. 08 C 1260, 2008 WL 4534154, at *3 (N.D. Ill. Oct. 7, 2008) ("There are no hard rules governing a district court's decisions in matters like these. The standard is whether a distribution is equitable and fair in the eyes of a reasonable judge.").

//

//

## III.   DISCUSSION

Objectors oppose the proposed treatment of their claims and the proposed distribution plan. For the following reasons, the Court **OVERRULES** their objections.

### A.   Claims Treatment

Objectors oppose the Receiver's proposed treatment of claims, including the Receiver's use of the MIMO method to calculate net losses and the exclusion of consequential losses. The Court received individualized oppositions from: 2Budz Holding, LLC, Wakefield Capital, LLC, and Wakefield Investments, LLC (collectively, the "Wakefield Investors"), (Dkt. 840); and Peterson Funding, LLC and ABC Funding, LLC (collectively, the "Peterson Entities"), (Dkt. 831).[2] The Wakefield Investors and the Peterson Entities object to the Receiver's treatment of their individual claims. For the following reasons, the Court agrees with the Receiver's proposed claims treatment and **OVERRULES** the objections. The Court **APPROVES** the proposed allowed claim amounts set forth in Exhibit A to the Receiver's Supplemental Declaration, (Dkt. 853-3), and Exhibit L to the Receiver's Declaration, (Dkt. 807-15). The Court **DISALLOWS** the claims set forth in Exhibits I and L to the Receiver's Declaration. (Dkt. 807-12, 807-15).

---

[2] The Court received an opposition and joinders to oppositions objecting to the use of the MIMO method and exclusion of interest and attorneys' fees from Objectors Susan Heller Fenley Separate Property Trust, Susan Heller Fenley Inherited Roth IRA, Shelley Lynn Tarditi Trust, Payson R. Stevens, Kamaljit K. Kapur, and the Payson R. Stevens & Kamaljit Kaur Kapur Trust. (Dkt. 828, 830, 836). The Court also received a joinder from Objector ROJ, LLC. (Dkt. 838). The Court considered these filings in reaching its decision, but, because they raise objections applicable to all Objectors, they aren't discussed individually.

The Court also received an opposition from Objector Chicago Title objecting to the Receiver's proposed treatment of their claims. (Dkt. 827). However, the Court approved the settlement agreement between Chicago Title and the Receiver, and Chicago Title no longer opposes the Distribution Motion. (*Id.* at 1).

Additionally, the Court **APPROVES** the proposed procedures for making adjustments to allowed claims (including amounts) and prior recovery rates and **AUTHORIZES** the Receiver to a file a "Notice of Allowed Claim Adjustment." (Dkt. 807-1 at 31–32).

### 1.    Money-in, Money-out Net Loss Calculation Method

The Receiver used the money-in, money-out ("MIMO") method to calculate net losses for each investor. Several investors object to the use of MIMO and the exclusion of interest and attorneys' fees from the net loss calculations. (*See, e.g.*, Dkt. 828 at 3, Dkt. 840 at 7–9). The Wakefield Investors also object to MIMO because it excludes the value of their claims against Chicago Title. (Dkt. 840 at 8). The MIMO method of calculating net losses has been endorsed by numerous courts as an "administratively workable and equitable method of allocating the limited assets of the receivership." *Cap. Consultants*, 397 F.3d at 737–38; *see also CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1116 (9th Cir. 1999) (approving a net loss calculation method equivalent to MIMO); *In re Tedlock Cattle Co.*, 552 F.2d 1351, 1352 (9th Cir. 1977) (same); *SEC v. Total Wealth Mgmt., Inc.*, No. 15-cv-226-BAS-RNB, 2018 WL 4353151, at *2 (S.D. Cal. Sept. 11, 2018) ("[T]he MIMO method thus appears to be a reasonable and practical method to ascertain the size of allowable claims against distributable assets."). MIMO remains an equitable method when the amount of allowed claims is reduced by the amount received from third-party settlements. *See Cap. Consultants*, 397 F.3d at 738–39 (describing MIMO calculations which allowed partial reduction in claims for claimants receiving third-party recoveries as "administratively workable and equitable"). A receivership court may delay recovery on claims for interest and attorneys' fees by excluding these claims from net loss calculations. *See SEC v. Francisco*, No. 8:16-cv-2257-CJC-DFM, slip op. at 6–17 (C.D. Cal. May 13, 2019), ECF No. 340 (approving receiver's proposal to allow investor claims based on MIMO calculations and disallow non-investor claims for interest, consequential

damages, and attorneys' fees).

This Court previously approved the Receiver's proposal to use the MIMO method to calculate net losses and to exclude additional amounts claimed as consequential damages—including interest, lost profits, or attorneys' fees—until such time the Receivership pays all MIMO net losses in full. (Dkt. 716). Based on that approval, the Receiver calculated net loss amounts and prior recovery rates for each investor without considering amounts claimed as interest, lost profits, or attorneys' fees. (Dkt. 807-1 at 8, Dkt. 681-1 at 15). Rejecting these MIMO calculations would require the Receiver to recalculate net losses for all investors, further delay distributions, and reduce already limited Receivership resources. The Court has considered the arguments opposing the use of the MIMO method and supporting the inclusion of consequential damages and finds them unpersuasive. The Court finds the MIMO method to be an "administratively workable and equitable" means of "allocating the limited assets of the [R]eceivership." *Cap. Consultants*, 397 F.3d at 738. The objections to the MIMO method are **OVERRULED**.

## 2. The Wakefield Investors

The Wakefield Investors object to the Receiver's proposal to treat ANI Development, LLC's ("ANI") purchase of a $750,000 membership interest in 2Budz Holding, LLC ("2Budz") as money-out in 2Budz's net loss calculation. (Dkt. 840 at 9–13). The Wakefield Investors argue that ANI's purchase was unrelated to 2Budz's investment in the liquor license loan program and, therefore, shouldn't be considered a distribution from the fraudulent scheme. (*Id.* at 10). Additionally, they argue the Receiver's proposed treatment of 2Budz's claim should be rejected because it doesn't provide for an appropriate means to liquidate the 2Budz membership interest held by ANI. (*Id.* at 12). In response, the Receiver argues ANI's purchase the membership interest was made to induce the Wakefield Investors to make additional investments in the fraudulent scheme.

(Dkt. 853 at 19–20). The Receiver contends the history of transfers between ANI and the Wakefield Investors indicates a "direct nexus" between the fraudulent investment scheme and ANI's transfer of $750,000 to 2Budz, and that this nexus supports treating the $750,000 transfer as money-out in 2Budz's MIMO net loss calculation. (*Id.* at 20, Dkt. 807-1 at 12). The Receiver also argues that including the $750,000 at issue in the MIMO calculation preserves Receivership assets by avoiding the additional cost of litigating the fraudulent transfer claim the Receiver has brought against 2Budz. (Dkt. 807-1 at 14–15); *see also* Compl., *Freitag v. 2Budz Holding, LLC*, No. 3:22-cv-885-LAB-AHG (S.D. Cal. June 17, 2022), ECF No. 1. The Receiver maintains that, with the cooperation of 2Budz, she will take whatever steps are necessary to terminate or cancel the membership interest. (Dkt. 807-1 at 16).

The Wakefield Entities are three separate but related entities: Wakefield Capital, LLC and Wakefield Investments, LLC—both owned by the Wakefield family, (Dkt. 840 at 2)—and 2Budz, LLC—owned by Wade Wakefield (through Wakefield Investments) and Greg Glassberg, (Dkt. 807-1 at 14). The relevant transactions between these entities and ANI are as follows:

- On May 12, 2017, 2Budz invested $1.5 million in the fraudulent scheme and transferred its investment to Chicago Title, (Dkt. 840 at 2);

- On February 7, 2018, Wakefield Capital invested $3.625 million in the fraudulent scheme and transferred its investment to Chicago Title, (*id.*);

- On June 18, 2018, Wakefield Investments invested $2 million in the fraudulent scheme and transferred its investment to Chicago Title, (*id.*);

- On June 19, 2018, and August 6, 2018, ANI transferred $500,000 and $250,000, respectively, to 2Budz for a membership interest, (*id.* at 6).

It is undisputed that Champion-Cain was operating a fraudulent Ponzi

scheme in which she would use money from new investors to pay back early investors.[3] ANI's initial $500,000 transfer came one day after Wakefield Investments made a $2 million dollar investment in the scheme. (Dkt. 807-2 ¶ 20). And all the funds ANI transferred to 2Budz came from an account containing commingled investor funds derived from the fraudulent scheme. (Dkt. 853-1 ¶ 7). Against this backdrop, the Court find that ANI's transfer of $750,000 to 2Budz was part of the larger fraudulent scheme and may appropriately be treated as money-out in 2Budz's net loss calculation. *See Lincoln Thrift Ass'n*, 577 F.2d at 606 ("[T]he district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership.").

This conclusion isn't disturbed by the Wakefield Investors' claim that the transfer is unrelated to the fraudulent scheme simply because ANI received a membership interest in 2Budz. 2Budz received funds derived from the fraudulent scheme in an apparent attempt to induce additional investment in the scheme. (*See* Dkt. 807-2 ¶ 20). The Receiver has treated other funds distributed from the scheme as money-out in the recipient's net loss calculation. The most equitable approach here is to treat the $750,000 transferred to 2Budz as a distribution from the fraudulent scheme and, therefore, as money-out in 2Budz's net loss calculation. *See Cap. Consultants*, 397 F.3d at 738–39 ("[E]quity demands equal treatment of victims in a factually similar case.").

Even if the transfer of $750,000 was unrelated to the fraudulent scheme, the

---

[3] The Court takes judicial notice of the plea agreement signed by Gina Champion-Cain in *United States v. Champion-Cain*, No. 3:20-cr-2115-LAB-1 (S.D. Cal. July 22, 2020), ECF No. 5. Courts may "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Proper subjects for judicial notice include "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007) (internal citation and quotation marks omitted).

funds can still permissibly be included in 2Budz's MIMO calculation because such inclusion will expedite the resolution of the issue, avoiding additional litigation and preserving Receivership assets. *See Ariz. Fuels*, 739 F.2d at 460. If the $750,000 isn't included in the MIMO calculation, the Receiver will continue to pursue recovery from 2Budz through the pending action for fraudulent transfer. *See* Compl., *Freitag v. 2Budz Holding, LLC*, No. 3:22-cv-885-LAB-AHG. By including the $750,000 in the calculation of 2Budz's claim, the Court is essentially permitting an equitable setoff via the claims and distribution process by reducing the value of 2Budz's claim against the Receivership. A court may permissibly approve such an equitable setoff during the distribution process as a means of offsetting a fraudulent transfer claim. *See, e.g.*, *Gordan v. Dadante (Gordan I)*, No. 1:05-cv-2726, 2010 WL 148131, at *5 n.6 (N.D. Ohio Jan. 11, 2010) (approving proposed distribution plan and empowering the receiver to offset "funds against individual investors for equitable reasons"); *Gordan v. Dadante (Gordan II)*, No. 1:05-cv-2726, 2010 WL 4137289, at *2 (N.D. Ohio Oct. 14, 2010) (overruling objections to proposed interim distribution when the receiver proposed offsetting commissions an investor received for recruiting additional investors into a scheme against the distributions to be made to the investor); *SIPC v. Old Naples Secs., Inc. (In re Old Naples Secs., Inc.)*, 343 B.R. 310, 320 (Bankr. M.D. Fla. 2006) (holding commissions and returns on investments paid in furtherance of a Ponzi scheme were avoidable as fraudulent transfers).

The Court finds the Receiver's proposed treatment of 2Budz's claim fair and equitable. The Wakefield Investors' objection is **OVERRULED**.

### 3. The Peterson Entities

The Receiver recommends disallowing the Peterson Entities' claims and instead allowing claims from investors whose investments in the scheme were coordinated by the Peterson Entities (the "Peterson Investors"). The Peterson Entities object to the Receiver's recommendation, arguing the proposal to deny

their claims is "unfair and unreasonable." (Dkt. 831 at 5).

### i.   Claims from Insiders can be Disallowed

The Receiver argues the Peterson Entities' claims should be disallowed because Kim Peterson—who controlled the Peterson Entities—and his associated entities were insiders to Champion-Cain's fraudulent scheme. (Dkt. 853 at 25, Dkt. 922 at 2–4). In response, the Peterson Entities argue it is inappropriate to exclude them on the basis of Peterson's alleged wrongdoing. (Dkt. 921 at 1–3). Receivership courts may approve distribution plans that exclude those who participate in the fraudulent scheme as insiders, marketers, or recruiters. *See, e.g.*, *SEC v. Byers*, 637 F. Supp. 2d 166, 184 (S.D.N.Y. 2009) (approving distribution plan that excluded "those involved in the fraudulent scheme" and describing the plan as "eminently reasonable and [] supported by caselaw"); *SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 660–61, 667 (6th Cir. 2001) (upholding distribution plan that reduced the recovery for any investor who received a commission for referring additional investors); *SEC v. Pension Fund of Am. L.C.*, 377 Fed. App'x 957, 963 (6th Cir. 2001) (upholding distribution plan that excluded a sales agent who received commissions for recruiting investors when the agent had no knowledge the pension fund was a fraudulent investment scheme). A claimant can be excluded from receivership distributions as an "insider" when they are involved with a scheme at a "more intimate level" than the typical investor, even when the insider had no knowledge the scheme was fraudulent. *SEC v. Merrill Scott & Assocs., Ltd.*, No. 2:02 CV 39, 2006 WL 3813320, at *11 (D. Utah Dec. 26, 2006) (approving distribution plan that excluded an investor who claimed to have no knowledge of the fraudulent nature of the investment scheme because he was an "insider" who was involved in the operation of the scheme and allowed his name to be used to recruit additional investors).

The Peterson Entities had extensive business relationships with

19-cv-1628-LAB-AHG

Champion-Cain and the Receivership Entities. The Peterson Entities were explicitly created to raise capital for investment in the liquor license lending scheme. (Dkt. 831 at 2–3). "Kim Funding raised capital by borrowing funds . . . under loan agreements that were often personally guaranteed by Mr. Peterson" and ABC Funding "raised capital from investors through a private placement memorandum." (*Id.* at 3). Both Peterson Entities entered funding agreements with ANI, which paid in proportion to the investments brought into the scheme. (Dkt. 807-13 at 371–84, Dkt. 807-14 at 972–82). Additionally, Kim Funding was a 1% equity holder and 50% voting member of ANI. (Dkt. 922-4) Peterson also had a personal friendship with Champion-Cain. (Dkt. 922-3). Champion-Cain testified that Peterson wasn't aware of the fraud, and Peterson has neither been found liable for his role in the scheme nor been charged with any wrongdoing. (Dkt. 921 at 2). Notwithstanding Peterson's ignorance of the fraud, the business relationships, recruitment efforts, compensation structure, and personal relationship all indicate that the Peterson Entities were involved in the scheme at a "more intimate level" than the typical investor. *Merrill Scott & Assocs.*, 2006 WL 3813320, at *11. The Court finds that the Peterson Entities were insiders in the fraudulent scheme at issue here.

### ii.    The Peterson Investors' Claims can be Allowed

The Receiver recommends allowing the Peterson Investors' claims. (Dkt. 807-1 at 25–26). The Peterson Entities object, arguing the Peterson Investors have only indirect claims against the Receivership while the Peterson Entities hold direct claims. (Dkt. 831 at 8). In support, the Peterson Entities cite *Kruse v. Securities Investor Protection Corp. (In re Bernard L. Madoff Investment Securities LLC)*, 708 F.3d 422 (2d Cir. 2013). The Receiver contends *Kruse* has no application here. (Dkt. 853 at 26).

In *Kruse*, the court held investors in "feeder funds" that then invested in the Ponzi scheme at issue weren't "customers" under the Securities Investor

Protection Act ("SIPA"). 708 F.3d at 426–27. *Kruse* doesn't control the outcome here. First, the court in *Kruse* was interpreting and applying SIPA, which applies only to registered broker-dealers. ANI isn't a broker-dealer, so *Kruse's* interpretation of SIPA isn't relevant. Second, the reasoning in *Kruse* supports allowing claims from the Peterson Investors. The *Kruse* court considered it particularly important that the feeder fund investors had no direct relationship with the Ponzi scheme, lacked control over the feeder funds' investments, and weren't identified in the Ponzi scheme's books or records. *Id.* By contrast, many of the Peterson Investors communicated directly with Chicago Title, Champion-Cain, and other ANI employees. (Dkt. 853 at 27). Many transferred their funds directly to Chicago Title and retained control of when to invest and withdraw their funds, and some even selected which fictitious liquor license loans to fund. (*Id.* at 27–28). Additionally, the escrow ledgers maintained by Chicago Title list the names of the Peterson Investors who directly transferred funds to Chicago Title. (*Id.* at 27). Based on these considerations, the Court finds *Kruse* unpersuasive.

The Peterson Entities also argue that denying their claims while permitting claims from the Peterson Investors is improper because it ignores existing contractual relationships and would require distributions to investors who are "strangers to the estate." (Dkt. 831 at 7–8, Dkt. 921 at 5–6). They contend that the Peterson Investors' only relationship to the scheme was with the Peterson Entities, not with ANI. The Receiver responds by arguing that the Peterson Investors did, in fact, have substantial connections to ANI. (Dkt. 922 at 4). The Court finds this objection unpersuasive. First, most of the funds solicited by Peterson were transferred directly to Chicago Title without moving through the Peterson Entities. (*See* Dkt. 922-1 ¶ 4). Second, many Peterson Investors had escrow agreements with *ANI and Chicago Title*. (*See, e.g.*, Dkt. 922-5). Pursuant to these agreements—which were, like all agreements in the scheme, fraudulent—the Peterson Investors transferred their funds to Chicago Title and

believed they maintained ownership and control over the funds. (Dkt. 922 at 4). The Peterson Entities never gained control over or access to the funds. (*Id.*). The Court finds that the relationship between the Peterson Investors, ANI, and Chicago Title is such that the Peterson Investors—not the Peterson Entities—are the proper claimants.

### iii.    The Peterson Entities Were Net Winners

Finally, the Peterson Entities argue that they are net losers in the fraudulent scheme under the MIMO method and it would be inequitable to exclude them from Receivership distributions. (Dkt. 921 at 5–6). As the Receiver points out, to reach this conclusion, the Peterson Entities must include the money invested and lost by the Peterson Investors in their net loss calculation. (Dkt. 922 at 5–6). Excluding the Peterson Investors' losses, the Peterson Entities received more than $12 million in net profits from the scheme. (Dkt. 853 at 25). The Peterson Entities also point out that Kim Peterson personally guaranteed many of the loan agreements with the Peterson Investors and that he remains exposed to personal liability in state actions brought by these investors. (Dkt. 831 at 6). The Peterson Entities contend that equity requires they receive distributions from the Receivership instead of the Peterson Investors. The Court rejects this argument. "[E]quity demands equal treatment of [similarly situated] victims." *Cap. Consultants*, 397 F.3d at 738–39. The Peterson Investors are similar situated to investors that were exclusively in contact with ANI and Chicago Title when investing. The Peterson Entities, by contrast, were insiders that helped to bring approximately $258 million of investments into the scheme. (Dkt. 807-1 at 25). Notwithstanding Peterson's personal exposure in other suits, it would be inequitable for entities controlled by such an insider to receive distributions instead of the investors he recruited. *See Merrill Scott & Assocs.*, 2006 WL 3813320, at *11.

\*    \*    \*

The Court finds the Receiver's proposed treatment of the Peterson Entities'

claims fair and equitable. The Peterson Entities objection is **OVERRULED**.

## B.   Distribution Plan

The Receiver proposes a detailed distribution plan which calls for making distributions in accordance with the Rising Tide distribution method. (Dkt. 807-1 at 10–11, 31–34). The Wakefield Investors object to the use of the Rising Tide method.[4] (Dkt. 840 at 14–15). They also object to the distribution plan on due process and "suitability" grounds. (*Id.*). For the following reasons, the Court agrees with the Receiver's proposals regarding the distribution method and distribution plan and **OVERRULES** the objections. The Court **APPROVES** the proposed distribution plan set forth in Exhibit A to the Receiver's Declaration. (Dkt. 807-4). Additionally, the Court **APPROVES** the proposed procedures for making interim distributions to holders of allowed claims and **AUTHORIZES** the Receiver to determine, in her business judgment, the appropriate total amount of distributable Receivership funds (along with the corresponding reserve of remaining Receivership funds) and to file a "Notice of Interim Distribution." (Dkt. 807-1 at 32–34).

### 1.   Rising Tide Distribution Methodology

The Receiver proposes using the Rising Tide distribution methodology to calculate distribution amounts for each claimant. (Dkt. 807-1 at 10–11). In highly

---

[4] The Court also received an opposition from Objector CalPrivate Bank ("CalPrivate") objecting to the proposed distribution plan. (Dkt. 837). CalPrivate and the Receiver have since reached a settlement agreement. (Dkt. 956). Pursuant to the terms of the agreement, CalPrivate has agreed to withdraw its objection and assign its claims against Kim Peterson and the Peterson Entities to the Receiver. (*Id.* at 2–3). The settlement is contingent on the Court both approving the settlement and authorizing the Receiver to pursue the assigned claims. (*Id.* at 3). The Court has set a briefing schedule and hearing date for the joint motion (Dkt. 957), but now conditionally approves the settlement and authorizes the Receiver to pursue the assigned claims. Therefore, CalPrivate's objection is **OVERRULED AS MOOT WITHOUT PREJUDICE**. If the joint motion is ultimately denied, CalPrivate will be permitted to renew its objection.

simplified terms, the Rising Tide method aims to achieve equivalent recovery rates for all claimants by considering each claimant's pre- and post-receivership recovery to determine prior recovery rates. (Dkt. 807-5 ¶¶ 1–2). Distributions are then made to claimants with the lowest rates of recovery first. (*Id.* ¶¶ 3–9). As a result, the Rising Tide method slowly brings all claimants to an equivalent rate of recovery. A more detailed description of the mechanics of the Rising Tide method is attached as Exhibit B to the Receiver's Declaration. (*Id.*); *see also SEC v. Huber*, 702 F.3d 903, 904–06 (7th Cir. 2012) (describing the mechanics of the Rising Tide method and comparing it to the net loss method). The Wakefield Investors object to the Rising Tide method and assert pro rata distributions would be more appropriate. (Dkt. 840 at 15). They make no argument why pro rata distributions would be more fair or equitable to the claimants as a whole. (*Id.*).

The Rising Tide method is widely endorsed as the most commonly used and equitable method for distributing receivership assets in fraud cases. *See, e.g.*, *Huber*, 702 F.3d at 906 ("Rising tide appears to be the method most commonly used (and judicially approved) for apportioning receivership assets."); *id.* (collecting cases approving the Rising Tide method); *CFTC v. Wilson*, No. 11-cv-1651-GPC-BLM, 2013 WL 3776902, at *7 (S.D. Cal. July 17, 2013) (concluding that "the Rising Tide Method is the most equitable remedy available"). The Rising Tide method is especially equitable when there are widely varying rates of recovery and factual circumstances distinguishing each claimant. *See Wilson*, 2013 WL 3776902, at *7.

The Court has considered the arguments against the Rising Tide distribution method and finds them unavailing. The Court finds that the Rising Tide method is the most equitable approach for distributing the Receivership's assets. The objection to the Rising Tide method is **OVERRULED**.

## 2. Due Process

The Wakefield Investors contend that the proposed distribution plan strips

them of their due process rights.[5] (Dkt. 840 at 14). District Courts supervising receiverships may "use summary procedure in allowing, disallowing, and subordinating the claims of creditors." *Ariz. Fuels*, 739 F.2d at 458; *see also Wencke*, 783 F.2d at 836–38 (approving summary proceedings to adjudicate claims on receivership assets); *Universal Fin.*, 760 F.2d at 1037 (same). When ruling on the fairness of a proposed plan to distribute receivership assets, a district court must provide claimants with due process. *See SEC v. Am. Cap. Inv., Inc.*, 98 F.3d 1133, 1146–47 (9th Cir. 1996), *overruled on other grounds by Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 94 (1998); *Wencke*, 783 F.2d at 836–38. Due process consists of adequate notice and an opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

The Wakefield Investors and other Objectors received notice of the Distribution Motion more than 90 days before the August 31, 2022 hearing, (*see* Dkt. 807-22); had almost 60 days to file briefs opposing the Motion, (*see* Dkt. 812); and were given a full and fair opportunity to present their objections during lengthy oral argument at the hearing, (*see* Dkt. 878, 884). The Court finds these procedures more than satisfy the requirements of due process. The Wakefield Investors' due process objection is **OVERRULED**.

### 3.   Suitability

The Wakefield Investors also raise three additional objections, arguing the distribution plan is "unsuitable." (Dkt. 840 at 14). They argue that the plan: (1) "has

---

[5] In a Court-ordered supplemental brief, the Peterson Entities argue the Court denied them due process by not holding additional argument on the Distribution Motion. (Dkt. 921). As the Court noted in its October 4, 2022 Order denying the Peterson Entities' motion requesting additional oral argument, "it is well settled that oral argument is not necessary to satisfy due process." (Dkt. 914 (quoting *Toquero v. INS*, 956 F.2d 193, 196 n.4 (9th Cir. 1992))). For the reasons discussed in its October 4 Order, the Court finds the Peterson Entities' have been provided with all the process they are due. (*Id.*).

too few specifics to be approved at this point" because it "is too open-ended with no deadlines [or] no dollar figures, not even aspirational ones"; (2) "fails to account for reserves or plan, or a deadline in the future, as to when all the pending litigation will be resolved"; and (3) "goes too hard for the" settlement agreement reached with Chicago Title. (*Id.* at 14–15). These objections lack merit. First, the distribution plan provides a clear structure for how distribution amounts will be calculated, (*see* Dkt. 807-1 at 10–11, Dkt. 807-5), and establishes clear procedures for making interim distributions, (*see* Dkt. 807-1 at 32–34). Second, the Court has already charged the Receiver to use her business judgment to manage ongoing litigation to maximize the net recovery for the Receivership Estate. (*See* Dkt. 493-1 at 11, Dkt. 551). Third, the Court has already approved the settlement with Chicago Title, rendering the final objection moot. (*See* Dkt. 926, 927).

The Wakefield Investors' objections to the suitability of the distribution plan are **OVERRULED**.

## IV.   CONCLUSION

The Court **OVERRULES** the objections and **ORDERS** as follows:

1.     The Distribution Motion is **GRANTED**, (Dkt. 807);

2.     The proposed allowed claim amounts set forth in Exhibit A to the Receiver's Supplemental Declaration, (Dkt. 853-3), and Exhibit L to the Receiver's Declaration, (Dkt. 807-15), are **APPROVED**;

3.     The claims set forth in Exhibits I and L to the Receiver's Declaration are **DISALLOWED**, (Dkt. 807-12, 807-15);

4.     The proposed procedures for making future adjustments to allowed claims (including amounts) and prior recovery rates are **APPROVED**, and the Receiver is **AUTHORIZED** to a file a "Notice of Allowed Claim Adjustment," (Dkt. 807-1 at 31–32);

5.     The distribution plan, attached as Exhibit A to the Receiver's

19-cv-1628-LAB-AHG

Declaration, is **APPROVED**, (Dkt. 807-4); and

      6.    The proposed procedures for making interim distributions to holders of allowed claims are **APPROVED** and the Receiver is **AUTHORIZED** to determine, in her business judgment, the appropriate total amount of distributable Receivership funds (along with the corresponding reserve of remaining Receivership funds) and file a "Notice of Interim Distribution," (Dkt. 807-1 at 32–34).

      **IT IS SO ORDERED.**

Dated:  February 24, 2023

**Hon. Larry Alan Burns**
United States District Judge

19-cv-1628-LAB-AHG